FILED
JAN 11 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICK A. VARNAL,

Plaintiff,

v.

DANISH MARINE REPAIR CO., an Oregon corporation, and OREGON LIEN SERVICE, INC., an Oregon corporation,

Defendant.

CV. 08-994-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

Plaintiff Patrick Varnal ("Varnal") filed this action on August 25, 2008, seeking to enjoin the public sale of his boat, the Yacht Ariel (the "Yacht"), scheduled to occur on September 2, 2008. The parties amicably resolved this issue by agreeing to a Stipulated Preliminary Injunction filed August 28, 2008, which enjoined Danish Marine Repair Co. ("Danish Marine") and Oregon Lien Services, Inc., ("Oregon Lien")[1] from conducting a possessory lien foreclosure sale until further order of this court. (Stipulated Prelim. Inj. at 2, August 28, 2008.)

[1]The claims against Oregon Lien were dismissed with prejudice pursuant to a joint motion filed by Varnal and Oregon Lien on April 29, 2009. (Judgment May 20, 2009.)

Varnal also asserted claims for breach of contract, conversion and unfair trade practices in his complaint. Varnal then requested and received leave to file a supplemental complaint. On January 16, 2009, Varnal filed a supplemental complaint asserting a claim for intentional interference with contract. Less than ten minutes later, Varnal filed a second supplemental complaint asserting the same claim for intentional interference with contract and an additional claim for negligence in storage.

Currently before the court are Varnal's motion for summary judgment on his First Claim for Relief for Declaratory Judgment, Second Claim for Relief for Breach of Contract, Fourth Claim for Relief for Unlawful Trade Practices, and Sixth Claim for Relief for Negligence in Storage. Danish Marine has filed its own motion for summary judgment on Varnal's Fifth Claim for Relief for Intentional Interference with Contract.

The court finds that Varnal's claim for declaratory judgment is moot in light of the stipulation of the parties and his motion for summary judgment on this claim is denied. Genuine issues of material fact exist with regard to Varnal's breach of contract, unlawful trade practices and negligence storage claims. Accordingly, summary judgment against these claims are denied as well. In the absence of any evidence supporting the allegations made in Varnal's Fifth Claim for Relief, Danish Marine's motion for summary judgment on Varnal's intentional interference with contract claim is granted.[2]

*Background*

Varnal purchased the Yacht in September 2007 and, shortly thereafter, arranged for Skeeter

[2]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

Kershaw ("Kershaw") of Nautek Marine, to conduct a survery of the Yacht. Kershaw recommended various repairs and improvements in his survey dated October 16, 2007. (Varnal Aff. dated August 25, 2008 ("First Varnal Aff.") ¶¶ 2-3.) Varnal immediately arranged for the replacement of the port and starboard stays by a rigging contractor, who left the old stays on the bulkhead. (First Varnal Aff. ¶ 3.) Varnal then arranged for Danish Marine to perform additional upgrades and repairs. Varnal delivered the Yacht to Danish Marine on January 25, 2008, along with Kershaw's survey. (First Varnal Aff. ¶ 4.)

Varnal remembers requesting that Danish Marine paint the hull, replace a port light, inspect the Yacht, and provide a written estimate of other work recommended by Danish Marine, and that Danish Marine quoted $895 as the cost for these services with no charge for the haul out. (First Varnal Aff. ¶ 4.) Jerry Miller ("Miller"), President of Danish Marine, testified that the quote of $895 was limited to the preparation and painting of the bottom of the Yacht only. Miller represents that he informed Varnal that he charged $69.00 an hour for labor at the initial meeting and that Varnal did not object to this rate. (Miller Aff. ¶ 6.)

Varnal expected that he would receive and sign a work order authorizing the specific work to be performed on the Yacht, the date the work would be done, and the price for the work, but represents that the "scope of work was never firmly established in any written work order." (Varnal Aff. dated January 27, 2009 ("Second Varnal Aff.") ¶ 2, Varnal Aff. dated March 21, 2009 ("Third Varnal Aff.") ¶ 13.) At this time, Varnal expected that the repairs to the Yacht would be finished sometime in April 2008 to allow him to enjoy the Yacht for the season. (Varnal Dep. 92:14-20.) In an affidavit, Varnal represents that Miller assured him that the refinishing and painting of the hull would be completed in April 2008. (Third Varnal Aff. ¶ 13.)

Danish Marine was not in the habit of writing up contracts with customers. Instead, Alisha Delong ("Delong"), Office Manager for Danish Marine, would provide a customer with a work order, which they would fill out, sign and return. The work order would then govern the work to be performed on the boat. (Delong Dep. 9:3-8.) Danish Marine did not require a credit application nor did it check a customer's credit before beginning work on a boat. (Delong Dep. 15:2-22.)

Delong testified that she provided Varnal with a blank work order ("Work Order") after his conversation with Miller and that Varnal "left with that work order and, at a later time, brought it back to me signed and filled out." (Delong Dep. 9:9:24-10:3.) Delong later clarified that she filled in the name and phone number on the Work Order; that Bryan Smith, a Danish Marine employee who worked on the Yacht, completed the description of the work, in part, from Kershaw's survey and, in part, from his conversation with Varnal; and that Varnal added his fax number and signature to the Work Order. (Delong Dep. 10:14-11:6.) Smith remembers discussing the items on Work Order several times with Varnal while on the Yacht. (Smith Dep. 12:2-18.) Varnal admits to seeing the Work Order but is "doubtful" that it is his signature on the document, and he has "no recollection of having signed it." (Second Varnal Aff. ¶ 2.)

The Work Order listed ten items from Kershaw's survey that needed to be addressed:

1) Replace deteriorated anchor rode

2) Install GFI receptacle

3) Provide two mounted USCG app fire extinguishers

4) Replace engine fuel lines to USCG specs

5) Install two SS clamps on all exhaust fittings

6) Install two SS clamps on all below water line connections

7) Service exhaust muffler

8) Replace frame seals and prove all are water tight (portlight/window frame)

9) Back stay chain plates are leaking - seal all

10) Replace compass

(Wade Sponsoring Aff. Ex. 101.) The Work Order listed the following items as additional repair requests: "repair shore painer cover, re-wire battery box, re-place battery charger, re-build cabin heater flue, re-pair broken hatch board, sound proof engine room." (Wade Sponsoring Aff. Ex. 101.) Smith understood that Varnal was planning to replace the anchor rode himself and that Danish Marine was not responsible for the repair or replacement of the auto navigation system. (Smith Dep. 39:14-16; 73:10-25.) Also, he remembers Varnal expressing concern that the hatch boards were leaking water and that Varnal wanted the hatch boards to be fixed first. (Smith Dep. 82:6-16.) Shortly after delivering the Yacht to Danish Marine, Varnal returned to his residence in Leawood, Kansas. (First Varnal Aff. ¶ 4.)

Both Delong and Smith testified that Varnal subsequently changed the work to be performed on the Yacht in phone conversations and email correspondence. (Delong Dep. 13:25-14:25, 18:10-15, 19:8-10; Smith Dep. 13:25-14:9.) Varnal agreed that he had numerous conversations with Danish Marine discussing the need for additional repairs to the Yacht. (First Varnal Aff. ¶ 5, Varnal Depo. 76:5-16.) Specifically, he stated that he probably spoke to Danish Marine on the phone about repairing the manual override switch for the bilge pump. (Varnal Dep. 75:11-23.)

Varnal states that he called Miller several times in February 2008, requesting a written estimate for parts and labor. (First Varnal Aff. ¶ 5.) It is undisputed that Varnal received an estimate from Danish Marine dated February 5, 2008, in the amount of $2,701.51 which set forth the cost of

the parts needed for the repairs to the Yacht (the "February Estimate"). Varnal found the February Estimate to be confusing because it lacked details about what needed to be done and did not include labor estimates. (First Varnal Aff. ¶5.) He did, however, make progress payments in the amount of $482.00 on February 12, 2008, and $376.00 on March 1, 2008.

In late March 2008, Varnal received an invoice from Danish Marine dated March 7, 2008, showing a total amount due of $8,593.53 (the "Invoice"), and a second written invoice dated March 5, 2008, setting forth the labor charges necessary to complete the requested work (the "March Estimate").[3] (First Varnal Aff. ¶ 6, Wade Sponsoring Aff. Exs. 103 and 105.) The March Estimate contained the additional work of installing three more portlights; a second solar vent; inspecting and repairing, if necessary, the fuel tank; rebuilding the cabin heater chimney and flue; finding and insulating the engine and interior wiring; removing the horn; installing a new transducer, radar bracket, and RAM VHF remote (including all accessories and wiring); and insulating the engine room.

Varnal noted that the March Estimate duplicated, to some degree, the February Estimate and also listed additional materials for additional work recommended by Danish Marine. (First Varnal Aff. ¶ 6.) Varnal could not reconcile the February Estimate and the March Estimate with the Invoice and was concerned because it seemed to be contrary to the understanding he had with Danish Marine that it "would not proceed with work beyond what I had asked him to do without submission by him

[3]When questioned about the difference between the dates on the documents and the dates they were received by Varnal, Delong explained that the computer system she uses to generate invoices and estimates automatically inputs the date the document was created and that she neglected to change that date once Varnal's invoices and estimates were finalized and printed. (Delong Dep. 39:1-41:1.)

to me of an estimate and my written approval." (First Varnal Aff. ¶6.) Varnal testified that Miller admitted that the Invoice was confusing and that he could not "make sense" of the estimates and the Invoice. (Third Varnal Aff. ¶ 14.) About this time, Miller directed his employees to stop working on the Yacht based on Varnal's failure to pay. (Smith Dep. 61:5-25.)

In early April 2008, Varnal hired Alizon Mazon, of Mazon & Associates, to survey the Yacht and determine what work had been performed by Danish Marine, what work was still needed, and whether the work performed and identified as additional proposed work by Danish Marine was necessary. (First Varnal Aff. ¶7.) The draft survey, dated April 14, 2008,[4] did not specifically answer Varnal's questions but did list six[5] items that required immediate attention, nine items needing timely attention and eight items characterized as maintenance items ("Mazon Draft Survey"). (Leo Aff. Exh. H at 6-8.) While not identifying whether the work was authorized by Varnal or performed by Danish Marine, Mazon noted that the wiring to the main 110VAC panel and battery charger was not adequately protected, that the heater installation was substandard and amatuerish, and that there were inadequate fire extinguishers (less than three) aboard and mounted, all needing immediate attention. (Leo Aff. Exh. H at 6.) She also recommended immediate action to repair a number of lights that were not operational and the outboard fuel primer bulb, which could not pass the Coast Guard flame exposure test, and to obtain and install a carbon dioxide and smoke detector. (Leo Aff. Exh. H at 6.) The items needing timely attention included replacing and providing proper drainage for the water heater pressure valve; replacing pipe, fittings, valves, vinyl

---

[4]Varnal did not recieve the final version of this survey until June 12, 2008. (First Varnal Aff. ¶ 7.)

[5]Mazon listed an inadequate number of fire extinguishers on board twice in her list of seven items needing immediate attention. (Leo Aff. Exh. H at 6.)

hoses, lifelines and vinyl coverings with new or better suited products; relocating the fuel tank vent; installing an anti-siphon loop in the engine raw water discharge system; fitting three seacocks with handles; labeling the 12V panel correctly; and repairing or replacing the manual switch for the bilge pump. (Leo Aff. Exh. H at 7.) At the end of the Mazon Draft Survey, Mazon specifically noted that:

> Owner has Danish Marine performing many major improvements and upgrades. New batteries, battery switch, battery cables and battery charger w/remote panel have been installed. New forward lower shroud chain plates have been installed. A new VHF has been installed. One of four new portlights has been installed. A new inverter has been installed. Blistered areas of the hull have been peeled and epoxy barrier coat has been applied. One back stay chain plate has been removed and remounted. All work is not yet completed to include flat panel electronics, radar, GPS chartplotter, etc.

(Leo Aff. Exh. H at 10.)

Throughout April 2008, Danish Marine continued to attempt to collect the amounts it felt was due and owing based on the Invoice. In an April 10, 2008, email, Delong advised Varnal that Danish Marine needed payment to continue with the work remaining on the Yacht. (Wade Sponsoring Aff. Ex. 106.) Varnal then made a third partial payment in the amount of $828 on April 15, 2008. Delong followed up with a second email dated April 23, 2008, informing Varnal that:

> I talked to Bryan and he said it would take him between 3 and 3.5 hrs per window depending on the time it takes to get the old one out and the hole clea[n]ed up. He has not installed the transducer or the remaining portlights. We need an additional payment of $6,067.53 (this is your remaining balance minus the bottom paint) before we can resume working on your boat. This amount is labor and materials that Danish Marine has paid out on your boat. Please let me know how you would like to proceed regarding this matter.

(Wade Sponsoring Aff. Ex. 107.) On May 27, 2008, apparently in response to a "customer report" from Danish Marine that indicated an unpaid balance of $6,411.03, Varnal made a fourth payment of $496.50. (First Varnal Aff. ¶ 8.) At this time, Varnal had paid nearly all of what he thought was

due, based on Mazon's survey and the original "estimate" of $2,701.51. (First Varnal Aff. ¶ 8.)

Varnal traveled to Portland, Oregon, on June 17, 2008, to inspect the Yacht. He found the Yacht floating in the water and recognized that some of the work he authorized had been properly completed. In his first affidavit, he specified that the installation of a plate on the transom, a new compass, and one of the two solar vents provided by Varnal, as well as repairing the main hatch, preparing the bottom of the Yacht for painting, and removing graphics from the Yacht, had been accomplished. (First Varnal Aff. ¶ 9.) In his third affidavit, Varnal indicated that he authorized, and had no objection to the charges for, installation of a solar vent, new batteries, an inverter and a battery charger; cleaning, calking, sealing, and painting the hull below the water line; and replacement of an existing port light with a larger version. (Third Aff. ¶ 15.)[6] Then, at his deposition, Varnal admitted to authorizing additional work noted on the Invoice, including installing a port chain place backstay (Varnal Dep. 58:13-24), a BC/AC switch (including the cutting of holes)(Varnal Dep. 69:6-11), a shaft zinc (Varnal Dep. 70:16-71:4), and new inverter cables (including a route to batteries and a lugs fuseblock for inverter)(Varnal Dep. 72:19-23); as well as doubling-up the SS hose clamps (Varnal Dep. 56:22-57:8), wiring the fuse for the inverter (Varnal Dep. 80:15-21), removing and reinstalling of the chain plate attached to the port side port light (Varnal Dep. 81:2-7), and clearing the old wires and rerouting new wires to the battery. (Varnal Dep. 82:16-20). Varnal made no claim in his deposition that these repairs had not been completed or any specific claim that the amounts charged for these services were not reasonable.

At the same time, Varnal had complaints about various items. First, Varnal was concerned

---

[6]The court recognizes that Varnal complains that the bottom painting and port light work was not completed when he inspected the Yacht on June 17, 2008, but is now not objecting to the charges related to those items.

that some of the work he authorized had not been completed. (First Varnal Aff. ¶ 9.) Specifically, he noted that installation of certain electrical equipment, the painting of the hull, and the repair of damaged electrical wiring and the transom leak, all authorized by Varnal, had not been completed as of June 17, 2008. (First Varnal Aff. ¶ 9, Third Varnal Aff. ¶ 12.)

Varnal was also concerned about the fact that Danish Marine had performed repairs and purchased parts not authorized by Varnal. (First Varnal Aff. ¶ 9.) Varnal denies authorizing the purchase of three additional portlights, a sounder, a transducer, an anchor line and anchor chain and the disabling of the autonavigation system, the removal of the Loran, soundproofing work and the installation of a teak panel, all items of work performed by Danish Marine. (First Varnal Aff. ¶ 9, Third Varnal Aff. ¶¶ 13, 15, Varnal Depo. 79:1-21.)

Finally, Varnal expressed concern about with the quality of the work performed by Danish Marine. (First Varnal Aff. ¶ 9.) Specifically, Varnal was not satisfied with the manner in which Danish Marine removed and replaced electrical wiring, which resulted in damage to the wiring. (First Varnal Aff. ¶ 9.) Varnal also noted that Danish Marine had removed the bulkhead stays/chain plates, which exposed portions of the Yacht to the weather. (First Varnal Aff. ¶ 9, Third Varnal Aff. ¶ 12.) Additionally, Varnal complained about the manner in which Danish Marine installed a portlight, and inverter and the back stays to the mast. (Third Varnal Aff. ¶ 15.)

Varnal discussed his concerns about Danish Marine's performance with Miller and explained to Miller that billing for work not yet completed was not a good business practice. (First Varnal Aff. ¶ 10, Second Varnal Aff. ¶2.) Varnal also did not think that he should be charged for time spent by Danish Marine discussing with Varnal what needed to be done to the Yacht or the time spent ordering parts. (Varnal Dep. 54:9-24.)

Varnal suggested a compromise and intended to offer to pay Danish Marine for the value of the authorized and properly performed repairs, which he believed would be between $1,800 and $2,500. (First Varnal Aff. ¶ 10.) Miller rejected any attempts at a compromise. (First Varnal Aff. ¶ 10.) At this point, Varnal directed Danish Marine to stop all work on the Yacht, including the painting and portlight work. (Second Varnal Aff. ¶ 3, Third Varnal Aff. ¶ 14.)

In early July, 2008, Varnal received a Notice of Foreclosure Sale from Oregon Lien Service indicating that the Yacht was scheduled to be sold at an auction on August 8, 2008, to pay for $7,636.03 due and owing Danish Marine ($6586.03 for services and $1,050 for storage). (First Varnal Aff. ¶ 11, Ex. F.) The auction date was subsequently reset for September 2, 2008. (First Varnal Aff. ¶ 11, Ex. G.). Varnal filed this action on August 25, 2008, seeking to enjoin the public sale of the Yacht. The parties resolved this issue by agreeing to a Stipulated Preliminary Injunction filed August 28, 2008, which enjoined Danish Marine and Oregon Lien from conducting the sale until further order of this court. (Stipulated Prelim. Inj. at 2, August 28, 2008.)

Varnal's legal counsel asked Mazon to conduct a second survey ("Second Survey") of the Yacht for the purpose of determining whether Danish Marine completed the work listed in the Invoice, evaluating the watertightness of hull penetrations, and providing her impression of the condition and value of the Yacht. (Leo Aff. Exh. I at 1.) In the Second Survey dated November 10 2008, Mazon listed all of the items billed in the Invoice, indicating whether each item was verified, fair and reasonable, and then provided the following summary:

> In this surveyor's opinion, the work completed was performed in a workmanlike manner and to current ABYC standards.
>
> • Some wiring is not yet completed so that wiring is not technically ABYC compliant at this time.

- Wiring to be completed is to the battery charger.

- The DC switch panel isn't screwed down yet (this only requires 4 screws).

- The wiring in front of the engine isn't yet loomed up as requested. However, this should not be done until all of the electrical work is completed.

- The work outlined in estimate #59 [March Estimate] is not yet competed. Installation of electronics in this estimate will require considerably more wiring to be installed.

- While not every labor operation could be directly confirmed, the general scope was completed, it was completed in a workmanlike manner, and the overall invoice amount is judged to be fair and reasonable.

(Leo Aff. Exh. I at 4.)

In November 2008, Varnal deposited the sum of $10,561.07 with the court in exchange for Danish Marine's release of the Yacht to Varnal pursuant to a stipulation and order entered on November 19, 2008. (Stipulated Order dated Nov. 19, 2008.) At this point, Danish Marine completed the work of painting the hull and installing the additional portlights. (Third Varnal Aff. ¶¶ 13, 17.)

The controversy continued. In early December, 2008, Danish Marine advised Varnal that before the Yacht could be safely transported the mast would have to be stepped. Danish Marine offered to complete this task for $500 and to load the Yacht on a trailer for an additional $180, and demanded a deposit of $2000 before it would perform these tasks. (Wade Aff. Exh. A at 2.) On December 11, 2008, Varnal's counsel requested "disclosure of what would be required in order to make the vessel ready for shipment", requested a prompt response, and indicated that he had 'hoped to avoid the proliferation of claims." (Wade Aff. Exh. A at 2-3.) In response, counsel for Danish Marine advised that Danish Marine had decided it did not want to deal with Varnal any longer,

refused to answer any questions about the condition of the Yacht, referred Varnal to the two surveys prepared on his behalf by Mazon, and assured that Danish Marine would deliver the Yacht to Varnal or his representative pursuant to the terms of the stipulated order. (Wade Aff. Exh. A at 1-2.) This was followed up with an email from Danish Marine's counsel stating that:

> The boat may be picked up at any time with reasonable notice. Danish Marine will remove the boat from the water at no charge. Your client is responsible for everything else necessary to move the boat. Danish Marine wants the boat removed at the earliest possible time. Danish Marine cannot be expected [to] expend further time and materials on the boat without a deposit.
>
> I want to make this very clear. The boat is available to be moved at any time with notice. Please let us know when your client wishes to move it. If your client believes there is other work necessary to ready the boat for the move, Danish Marine will cooperate with whomever is to perform the work so that they have reasonable access to it.

(Wade Aff. Exh. B.)

Upon receiving custody of the Yacht and towing[7] it to A&D Yacht Repair Service in late 2008, Varnal reported that the wood laminate floor of the vessel had suffered water damage which will cost $1,700 to repair. (Varnal Aff. ¶ 18.) Miller testified that he personally inspected the Yacht in early 2008 and noticed that the wooden floor of the cabin was discolored and damaged at that time. He stated that he thereafter maintained the cover and entry of the boat to prevent leakage into the cabin and protect the cabin floor from additional damage. (Miller Aff. ¶ 2.)

On January 15, 2009, Danish Marine filed a motion seeking summary judgment on its First Counterclaim in which it sought to recover the agreed charges for labor and materials provided or the reasonable value thereof. After hearing oral argument, the court granted the motion to a limited

---

[7]The Yacht had to be towed because the batteries were not connected. (Third Varnal Aff. ¶ 17.)

extent, finding that "plaintiff would be liable to defendant under a quantum meruit theory for the value of services defendant performed on plaintiff's yacht or liable to defendant to the extent that defendant's services enhanced the yacht's value." (Order, March 6, 2009.) The court expressly declined to determine the reasonable value of the services, the amount Varnal owes for the services, whether the services were authorized by Varnal or increased the value of the yacht in any way, and whether Danish Marine owes Varnal any monies for damage to the yacht. (Order, March 6, 2009.) Varnal and Danish Marine then filed the cross-motions for partial summary judgment currently before the court.

Varnal concedes the existence of a contract, but contends that the terms of the contract are in dispute. (Second Varnal Aff. ¶ 3.) He also admits that it is likely that some additional sum is due to Danish Marine despite the fact that Danish Marine billed for work which Varnal did not authorize and for work it did not do. (Second Varnal Aff. ¶4.) Varnal asserts that any sums due should be offset by the damage suffered by the Yacht while in the custody of Danish Marine. (Second Varnal Aff. ¶4.)

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of

a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

Varnal moves for summary judgment on his First Claim for Relief for Declaratory Judgment,

Second Claim for Relief for Breach of Contract, Fourth Claim for Relief for Unlawful Trade Practices, and Sixth Claim for Relief for Negligence in Storage. Danish Marine has filed its own motion for summary judgment on Varnal's Fifth Claim for Relief for Intentional Interference with Contract. Neither party seeks summary judgment on the Fourth Claim for Relief for Conversion.

I. Varnal's Motion for Partial Summary Judgment

A. First Claim for Relief - Declaratory Judgment

In his First Claim for Relief, Varnal asserts that Danish Marine's attempt to sell the Yacht under Oregon law violates the United States Constitution, which vests exclusive jurisdiction over maritime liens and payment claims asserted against a vessel in this court and that the Maritime Lien Act (42 U.S.C. § 30301) preempts and supercedes any contrary provision of Oregon law. Varnal sought a temporary restraining order or an injunction prohibiting the sale of the Yacht pending further order of this court, the appointment of a qualified marine surveyor report to the court and parties on the scope of work performed and reasonableness of expenses billed by Danish Marine, and an accounting of the reasonable value due Danish Marine for work properly performed and billed.

Varnal concedes that his claim for declaratory judgment, which asks the court to determine that federal law governs Danish Marine's attempt to assert and foreclose on a lien interest in the Yacht and to enjoin the state foreclosure process, may be "mooted by the acquiescence of the parties, but nonetheless should be resolved at this stage of the proceedings." (Pl.'s Mem. Supp. Mot. Partial Summ. J. 10.) In its opposition brief, Danish Marine also notes that this claim is likely moot based on the stipulated injunction.

The relief requested by Varnal in his claim for declaratory judgment has already been granted by virtue of the Stipulated Preliminary Injunction filed August 28, 2008, which enjoined Danish

Marine and Oregon Lien from conducting the sale until further order of this court, the transferring of custody of the Yacht to Varnal, and the preparation of a survey by Mazon. Additionally, Danish Marine concedes in its Second Amended Answer that this court has original jurisdiction over this action and that federal law applies to any maritime lien claims asserted by Danish Marine against the Yacht. The court finds that Varnal's First Claim for Relief is now moot. Varnal's motion for summary judgment on this claim is denied.[8]

B. Second Claim for Relief - Breach of Contract

Varnal asserts that Danish Marine breached its contract with him in a number of particulars, including: 1) failing to provide specific estimates, including a defined scope of work, a due date or time for performance and re-delivery of the Yacht, definite price terms, and other terms needed for performance of work in a businesslike and workmanlike manner; 2) failing to perform the work in a workmanlike manner and in accordance with implied warranties; 3) not completing all necessary work; 4) failing to do work within the scope of its claim for payment; 5) damaging systems aboard the Yacht unrelated to the work it was to perform; and 6) refusing to provide documentation supporting the work claimed to be completed, including material costs and labor. Varnal alleges that

---

[8]Varnal alleges in his complaint that this court has jurisdiction over this action "pursuant to 28 U.S.C. § 1331 in that the questions presented arise under the Statutes and Constitution of the United States, and 28 U.S.C. § 1333 and 46 U.S.C. [§] 30301 granting exclusive jurisdiction of questions relating to foreclosure of maritime liens claimed against vessels documented under the laws of the United States, and further, under jurisdiction for a Declaratory Judgment under the [United] States Declaratory Judgment Act, 28 U.S.C. § 2201 and over closely related state claims under 28 U.S.C. § 1367." (Compl. ¶ 2.) It would appear that the amicable resolution of the First Claim for Relief by the parties, making the claim moot, eliminates the grounds for federal jurisdiction alleged in the complaint. However, the court finds that, even in the absence of the First Claim for Relief, it continues to have admiralty jurisdiction over Varnal's claim for breach of contract under *N. Pac. Steamship Co. v. Hall Bros. Marine Ry. and Shipbuilding Co.*, 249 U.S. 119, 127 (1919)(A contract for the repair of a vessel placed in navigable waters falls within this court's admiralty jurisdiction.).

he has payed all amounts and performed all obligations under the contract.

"Contracts for the repair of ships are governed by admiralty law." *Point Adams Packing Co. v. Astoria Marine Constr. Co.*, 594 F.2d 763, 766 (9th Cir. 1979)(citing *N. Pac. Steamship Co. v. Hall Bros. Marine Ry. and Shipbuilding Co.*, 249 U.S. 119, 127 (1919)). In contract actions requiring the application of federal maritime law, courts apply federal common law and, where appropriate, look to the Uniform Commercial Code for guidance. *Flores v. American Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003)(when federal maritime law governs an action, courts are to apply federal common law in interpreting the contracts.); *Interpool Ltd. v. Char Yigh Marine S.A.*, 890 F.2d 1453, 1459 (9th Cir. 1989)("In maritime commercial transactions, the Uniform Commercial Code is taken as indicative of the federal common law of admiralty."). State law may supplement federal admiralty only when the matter at hand is of local concern and the "state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." *Pac. Merch. Shipping Ass'n. v. Aubry*, 918 U.S. F.2d 1409, 1422 (9th Cir. 1990)(emphasis in original).

Varnal's breach of contract claim relies on the existence of a contract and a breach of the express or implied terms of that contract. Under the Uniform Commercial Code (the "Code"), a contract is formed by an offer and acceptance of that offer. U.C.C. § 2-204(1). Generally, a contract for the sale of goods at a price in excess of $5,000 must be signed by the party against which it is to be enforced. U.C.C. § 2-201(1). However, conduct by both parties recognizing the existence of a contract is sufficient to establish a contract, even where one or more terms are left open. U.C.C. § 2-204.

Both parties concede that a contract for the repair and restoration of the Yacht exists. The

questions of whether the contract was in writing, as evidenced by the Work Order, and the specific work to be performed under the contract remain at issue. The parties are diametrically opposed on these issues.

Varnal represents that he expected to receive specific estimates, including a defined scope of work, a due date or time for performance and re-delivery of the Yacht, and definite price terms from Danish Marine. There is no evidence that Varnal shared this expectation with anyone at Danish Marine. In fact, Varnal acted to the contrary by authorizing repair work, both before and after the fact, over the telephone without requiring specific estimates, dues date or price terms, paying for the performance of some of the work, and complaining that Danish Marine did not complete all of the work requested.

It would appear from the Work Order that Varnal and Danish Marine entered into a written agreement for the repairs listed on the Work Order, which seems to encompass a number of the services rendered on the Yacht. Both Delong and Smith represent that Varnal assisted in the preparation of the Work Order and signed the Work Order before he returned to Kansas. However, Varnal disputes that he ever signed the Work Order or that he authorized all of repairs listed on the Work Order. Varnal admits that he orally authorized a number of repairs after returning to Kansas but he fails to identify which specific repair items he discussed with Danish Marine. Smith testified that all of the work he performed on the Yacht was previously authorized by Varnal either orally or in writing. (Smith Dep. 85:11-14.)

Additionally, contradictions in Varnal's own testimony add to the confusion surrounding the agreed-upon scope of Danish Marine's work. For example, Varnal complains on numerous occasions that Danish Marine improperly charged for the painting of the hull prior to the completion

of the work (even though the record makes it clear that Danish Marine did not expect to be paid for the work until it was completed), but then recently indicates that he had no objection to the painting the hull. Similarly, Varnal asserts that he did not authorize soundproofing when soundproofing was listed on the Work Order. The summary chart prepared by Varnal's counsel also contradicts Varnal's testimony. For example, in his deposition Varnal admits to authorizing the installation of a port chain place backstay, a BC/AC switch and a shaft zinc, the doubling up of the SS hose clamps, the clearing of old wires, and the rerouting of new battery cables. The summary chart indicates that Varnal did not authorize these repairs but merely asked for a written estimate of the cost to accomplish these items.

While the parties agree that a ship repair contract exists, it is unclear what obligations Danish Marine had under the terms of that contract. Accordingly, based on the evidence currently before the court, the court is unable to determine whether Danish Marine completed the work it was authorized to perform or charged for work that it was not authorized to perform. The court finds that a genuine issue of material facts exists with regard to the terms of the contract and whether that contract was breached. Varnal's motion for summary judgment on his breach of contract claim is denied.

C. Fourth Claim for Relief - Oregon Unlawful Trade Practices Act

In support of his claim under Oregon's Unlawful Trade Practices Act (the "Act"), Varnal alleges that:

> Between February 5, and April 14, 2008, Defendant Danish Marine entered into a course of dealing with the Plaintiff during which it represented, through its officers and agents, that:
>
> (a) The work scheduled for completion by Danish Marine would render the

vessel seaworthy and reasonably fit for its intended use.

(b) That the work completed was properly performed so as to constitute a workmanlike repair to the conditions needing attention aboard the vessel.

(c) That the work invoiced was competently performed and completed.

(d) That the amounts invoiced were fairly priced for cost at a reasonable value for labor and materials which was in accordance with prevailing sums due in the Portland, Oregon area for similar work performed.

(Compl. ¶ 27.) Varnal further alleges that on April 22, 2008, after Danish Marine advised him that it was suspending work on the Yacht, he learned that:

(a) The work agreed to was not performed, in part;

(b) The work paid for was not performed, in part;

(c) The work invoiced, and for which a deposit was requested, was not performed nor scheduled to be performed.

(d) The amounts invoiced were inflated and contained components for which no goods nor services had been provided.

The court questions whether Varnal is able to state a claim for violation of the Act in light of decisions by federal courts that specific state consumer protection acts conflict with maritime law and are, therefore, not applicable to admiralty actions. *DeRossi v. Nat'l Loss Mgmt*, 328 F.Supp.2d 283 (D. Conn. 2004)("[B]ecause the damages provision of CUTPA [Connecticut Unfair Trade Practices Act] regarding attorney's fees and punitive damages are not consistent with the standards established in admiralty law, the CUTPA claim is preempted."), *Geftman v. Boat Owners Ass'n of United States*, No. C/A 2:02-1461-18, 2003 WL 23333312 (D. S.C. Dec. 2, 2003)(Treble damages and attorney fees provisions of the South Carolina Unfair Trade Practices Act were inconsistent with federal admiralty law and, therefore, preempted.) In any event, it is evident that genuine issues of

material fact exist with regard to this claim.

Varnal's trade practices claim is based, in large part, on his allegations that Danish Marine's services were not completed or not performed in a workmanlike manner and that the amounts charged for the services were inflated. The opinion of Mazon set forth in the Second Survey that the general scope of Danish Marine's work "was completed, it was completed in a workmanlike manner, and the overall invoice amount is judged to be fair and reasonable" raises, at the very least, a genuine issue of material fact with regard to these allegations. Varnal is not entitled to summary judgment on his claim for relief under the Act.

D. Sixth Claim for Relief - Negligence in Storage

In his second Supplemental Complaint, Varnal alleges that Danish Marine failed to protect the Yacht from water damage while in its custody and failed to clean or prepare the Yacht for transport once Varnal posted the cash deposit with the court in early November, 2008. Once again, the court is not convinced that this claim can survive federal maritime law preemption. Contracts for the repair and storage of a boat have been held to be maritime contracts subject to federal admiralty jurisdiction. *Fletcher v. Port Marine Center, Inc.*, Civ. A. No. 8901974-N, 1990 WL 25536 at *2 (D. Mass. Aug. 7, 1990)("[C]ontracts for the storage of vessels falls within the admiralty jurisdiction of this court" and "general maritime law, not Massachusetts law, supplies the rule of decision."), *Am. E. Dev. Corp. v. Everglades Marina, Inc.*, 608 F.3d 123 (5th Cir. 1979) (action to recover damages to pleasure boats stored while owners were not using them arose in admiralty), *Medema v. Gombo's Marina Corp.*, 97 F.R.D. 14, 15-16 (D. Ill. 1982)("Admiralty jurisdiction exists where the contract provides for storage *and* repair or other service.")(emphasis in original); *Schuster v. Baltimore Boat Sales, Inc.*, 471 F.Supp. 321, D. Md (1979)(court had admiralty jurisdiction over

contract action for damage to a sailboat stored for the winter). However, even if the negligence claim survives, Varnal has failed to establish that he is entitled to summary judgment on this claim.

Varnal asserts that Danish Marine's lack of care resulted in water damage to the wood laminate floor of the Yacht. Miller represents that the wooden floor of the cabin was discolored and damaged when he first inspected the Yacht in January 2008. This creates a genuine dispute with regard to when the damage occurred and who is responsible for it.

Varnal also argues that Danish Marine failed to clean or prepare the Yacht for transport before it relinquished custody of the Yacht to Varnal's agent. Varnal has failed to establish that Danish Marine had an obligation or duty, contractual or otherwise, to clean and prepare the Yacht for transit. Varnal's motion for summary judgment on his negligence in storage claim is denied.

II. Danish Marine's Motion for Partial Summary Judgment

Danish Marine seeks summary judgment on Varnal's claim for intentional interference, which is included in the first supplement complaint filed January 16, 2009, based on Danish Marine's alleged failure to cooperate with the transportation of the Yacht to another repair facility. Specifically, Varnal alleges that on December 8, 2008, it confirmed that Schooner Creek would take custody of the Yacht from Danish Marine for transport to another facility, and that Schooner Creek cancelled the transport the next day after a conversation with Danish Marine. Danish Marine then demanded that Varnal pay the sum of $500 to remove and secure the mast, and the sum of $180 to load the Yacht, and advised Varnal that he must deposit the sum of $2,000 before Danish Marine would make the Yacht ready for transport.

With the exception of the emails exchanged on December 11, and December 12, 2008, between counsel for Varnal and Danish Marine offered by Danish Marine, which address only

Danish Marine's offer, and then withdrawal of the offer, to prepare the Yacht for transport, there is no evidence in the record relevant to Varnal's intentional interference with contract claim. The evidence establishes only that Danish Marine offered to facilitate the transport of the Yacht and to make it available to Varnal and his agents at any time, subject to reasonable notice. While the allegations of the complaint assert that Danish Marine interfered with Varnal's attempt to transport the Yacht on December 9, 2008, Varnal may not rely on these allegations in opposition to Danish Marine's motion for summary judgment on this claim. The Federal Rules of Civil Procedure make it clear that:

> [w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e)(2). Danish Marine is entitled to summary judgment on Varnal's claim for intentional interference with contract.

*Conclusion*

Varnal's motion for partial summary judgment on his First, Second, Fourth and Sixth Claims for Relief is DENIED. Danish Marine's motion for summary judgment on Varnal's Fifth Claim for Relief is GRANTED.

DATED this 11th day of January, 2010.

JOHN V. ACOSTA
United States Magistrate Judge